LYNN ROBINSON, a Minor, by Her Father and Next Friend, LEON G. ROBINSON, Plaintiff-Appellee, Cross-Appellant, *v.* GENE R. DECK *et al.*, Defendants, Third-Party Plaintiffs-Appellants, Cross-Appellees.— (GENERAL MOTORS *et al.*, Third-Party Defendants-Appellees.)

(No. 58166; ■)

First District (2nd Division)—October 14, 1975.

Pretzel, Stouffer, Nolan & Rooney, of Chicago (Joseph B. Lederleitner, of counsel), for appellants.

Kirkland & Ellis, of Chicago, for appellee Firestone Tire & Rubber Co.

Baker & McKenzie, of Chicago, for appellee General Motors Corp.

Philip H. Corboy and Associates, of Chicago (Philip H. Corboy and Paul B. Episcope, of counsel), for appellee Lynn Robinson.

Mr. JUSTICE STAMOS delivered the opinion of the court:

The jury returned a verdict in favor of plaintiff against Maierhofer Brothers, Inc. (hereafter defendant) only and assessed damages in the amount of $40,000. The jury exonerated all other defendants. Judgments were entered upon these verdicts. The trial judge then granted the third-party defendants' motions for directed verdicts on defendant's actions over for indemnity.

Defendant presents two issues for our consideration: (1) whether the verdict and judgment against defendant is supported by the manifest weight of the evidence, and (2) whether the ruling by the trial court in favor of the third-party defendants on their motions for directed verdicts was reversibly erroneous. As cross-appellant, plaintiff claims that if the

judgment against defendant is reversed, the judgments in favor of the additional defendants should also be reversed.

The occurrence giving rise to this action can be simply stated. On February 28, 1967, School Bus No. 30, owned by defendant and operated by its agent, went out of control in the vicinity of 4400 North Lake Shore Drive. Without colliding with other vehicles, the bus veered to the left, crossed a raised median divider and four southbound lanes, coming to rest against a tree in the parkway west of Lake Shore Drive. Plaintiff, a passenger in the bus, sustained leg injuries.

Plaintiff brought this action for damages against the bus driver, Gene Deck, and defendant, alleging negligence in the operation and maintenance of the bus. Deck and defendant filed a third-party complaint against General Motors Corporations and All Brake & Drive Unit Service, Inc., the manufacturer and distributor of the chassis on Bus No. 30, and against Firestone Tire & Rubber Company, the manufacturer of the left front wheel rim assembly. In the event that defendants were held liable to plaintiff, they sought indemnification on one of three theories: strict liability in tort, negligence, or breach of warranty. Plaintiff amended her complaint and added a count in strict liability in tort against the third-party defendants and also a count in negligence against Firestone.

## I.

The evidence reveals that for at least 30 years preceding the accident, defendant's primary business involved providing school bus transportation. Bus No. 30 was part of defendant's fleet of approximately 80 buses. Defendant had a maintenance garage where all mechanical work on its vehicles was performed. Before considering the issues raised by defendant, it is necessary to summarize the pertinent testimony adduced at trial.

The bus driver testified that he was travelling below the speed limit in light traffic at the time of the accident. He heard a noise, the left front portion of the bus dropped, and the bus veered to the left as the steering wheel yanked out of his hand. He was unable to stop the bus by depressing the brake pedal, or to otherwise regain control of the vehicle.

An expert in metallurgy, Dr. Gordon, was engaged by defendant to investigate the cause of the accident.[1] Dr. Gordon examined the wheel

---

[1] Dr. Gordon has been a professor, author and consultant in the field of metallurgical engineering. Having conducted research concerning the relationship between the properties of metals and the internal structure of metals, he was engaged in metallurgical engineering consultation at the time of trial. His primary practice involved the investigation of failures in metallic devices and structures, including wheels.

assembly of the left front tire of Bus No. 30.[2] He testified that sections of the wheel assembly were heavily corroded, particularly in the vicinity of the trough on the base rim. He also observed rust on the edge of the side ring located near the trough. Part of the locking lip on the side ring was broken off, which Dr. Gordon attributed, in part, to corrosion. Similar signs of heavy corrosion in the trough area of 20-30 other wheels dismounted from defendant's buses subsequent to the accident were observed. In his opinion, the locking lip would not have broken off unless it had undergone severe corrosion occurring over an extended period of time. He further stated that since the lip is not visible when the wheel is assembled, merely wire brushing the outside of the wheel assembly would not effectively solve the problem. Although he had no experience in bus maintenance, he said it would be advisable to wire brush the critical interior surfaces of the wheel assembly and then apply a preservative paint. Dr. Gordon believed that a tire, during operation, could come off of a wheel which was heavily corroded and had pieces of the locking lip broken off. Since the trough area tended to trap water within the wheel assembly, he attributed the severity of the corrosion in this area to the design of the wheel.[3] Dr. Gordon stated that he was unfamiliar with the nomenclature of the parts of a wheel assembly.

Representatives of All Brake testified that Bus No. 30 was delivered to defendant in 1958 and was at that time equipped with one-piece wheel rims. The chassis, which includes the wheel assembly and tires, is delivered from General Motors to a body company. All Brake then receives the bus and inspects the vehicle prior to delivery. Except for an operator's manual which is placed in the glove compartment by General

---

[2] At the time of the accident, the bus was equipped with two-piece wheel rim assemblies, the component parts of which are a base rim and a continuous side ring. Locking lips on the base rim and the side ring form a hooking mechanism by which these components are coupled together. A disc, which provides the means for attaching the entire assembly to the chassis, is riveted to the center portion of the base rim. A complete assembly of these metal parts is referred to as the "wheel", upon which the tire is fitted. The base rim of this particular type of assembly has a trough or depressed area along its circumference.

[3] Objection was made to Dr. Gordon's reference to the "design" of the wheel, whereupon a side bar conference was held. The ground for the objection was that no foundation was laid to show the witness' expertise in design engineering, and in particular, in the design of wheels. The trial judge determined that since metallurgy pertained to the relationship between moisture and metal, it was proper for Dr. Gordon to refer to a "moisture gathering object" that he had observed. The judge suggested that the witness' familiarity with multi-piece wheels be brought out. When the proceedings resumed, no attempt was made to establish Dr. Gordon's expertise in design engineering, and the line of questioning that was objected to was not pursued.

Motors, neither General Motors nor Firestone supplies All Brake with literature to be distributed to its customers.

A manager of General Motors, who was not a wheel expert, testified that, to the best of his knowledge, the only recommendation General Motors makes to its customers regarding proper wheel maintenance is that the internal surfaces should be cleaned with a wire brush prior to mounting. In his opinion, the resulting force from a side ring becoming unattached from a base rim, without more, would be insufficient to sever the hydraulic brake line. In 1970, General Motors discontinued supplying two-piece rims.

An engineer for Firestone, presented as an expert with respect to truck wheels and wheel rims, testified that Firestone had manufactured the principal parts of the wheel rim assembly in question, and that Firestone had sold 22-24 million of these wheels. This type of rim is the most popular rim in the "medium truck" field. After examining the parts from Bus No. 30, he testified that the wheel assembly would probably come apart due to its heavily corroded and chipped surfaces. He also stated that the tire which had been removed from the wheel was practically bald. He testified that proper rim maintenance is necessary because an imperfect fit results from the metal to metal contact between the component parts, and therefore, water on the roadway can seep in and cause corrosion. Visible rust on the exterior of the wheel is an indication that there is probably rust and corrosion on the rim. The problem of rust and corrosion in the wheel assembly is prevalent throughout the industry. Since Firestone sells these parts through distributors, defendant would not have received any Firestone literature directly from Firestone. However, Firestone distributes literature in bulk to its customers, including General Motors, which recommends wire brushing and painting as proper maintenance techniques and the replacement of rusted rims. This literature does not state that the wheel need be disassembled periodically nor that it be painted while disassembled. Disassembling the wheel would be convenient whenever the tire is balanced, rotated or replaced. Firestone does not recommend a specific maintenance schedule to its customers. The owner of the vehicle can better determine what maintenance schedule should be followed since he is familiar with the extent of the vehicle's use and the environmental conditions to which it is commonly exposed. In his opinion, if the side ring pulled off of the base rim while the bus was moving, a "terrific noise" would ensue and the hydraulic brake line would possibly be severed. In response to a hypothetical question, he believed that a wheel rim assembly would be in

poor condition, similar to the corroded state of the wheel in question, if it had only been brushed but not painted in March of 1963 and then exposed to Chicago's climatic conditions until February of 1967.

Defendant's president testified that its buses were greased every 2000 miles. Defendant does not rotate its tires, but does repair flats and replace tires which become worn out. He further testified that State law requires school buses to be inspected once or twice each year, tires to have a minimum of $\frac{3}{32}$ tread, and the wheels to be dismounted and inspected once each year or every 10,000 miles. He said that the latter requirement does not mean that the wheel should be separated from the tire. Defendant inspected its tires in this manner about every 10,000 miles. Two-piece wheel rim assemblies, which were received from All Brake as spare parts, were mounted on Bus No. 30 in 1959 so that larger tires could be accommodated. Prior to the mishap, defendant did not know that the wheel rims required maintenance because repair manuals had not been provided with them. The witness had noticed in the past, however, mechanics in defendant's garage brushing rims to remove rust. Defendant was aware of the rust problem, but did not realize cracks could result. He did not recall receiving an owner's manual in the glove compartment of the bus. He was not certain whether defendant's mechanics were adequately familiar with this type of equipment without referring to a service manual. Defendant began keeping maintenance records in 1963. Older records are destroyed after a period of time, regardless if the vehicle to which they refer is still in operation. Defendant did not keep records showing when tires were removed and rims inspected. Defendant's maintenance records reveal that the left front tire on Bus No. 30 was replaced in March of 1963 after the bus had travelled in excess of 78,000 miles. Also, a cracked left rear wheel rim was replaced less than two months before the accident. By that time, the bus had travelled about 121,000 miles. Bus No. 30 passed an authorized safety lane inspection approximately two months prior to the accident.

Defendant's chief mechanic testified that in 1963, defendant's preventive maintenance procedure involved disassembling the wheel, brushing the interior surfaces to remove rust, and visually inspecting the exterior of the wheel assembly for cracks. This procedure did not include painting the component parts of the wheel. A visual inspection was performed every 1000-1500 miles. He stated that prior to the accident, he was aware of the necessity for proper rim maintenance. He did not recall seeing any literature distributed by Firestone, All Brake or General Motors which recommended periodic inspection and painting of the rims. The side ring of the wheel assembly in question was probably never

painted by defendant because the color of the ring at the time of the accident was the same as the factory finish. The mechanic admitted that during his ten years of employment with defendant, whenever a cracked rim was discovered, an investigation to determine the cause of failure was not conducted. Although not a wheel expert, it was his theory that the accident was caused by a design fault in the wheel rim.

## II.

Defendant presents two arguments upon which it contends that the liability of the third-party defendants was established by the overwhelming weight of the evidence: (1) the record shows that the design of the left front wheel assembly on Bus No. 30 was defective, and its subsequent failure was the proximate cause of the accident, and (2) the third-party defendants failed to advise defendant of the proper procedure for maintaining the wheel assembly, and further, they breached a duty to warn defendant of the condition which could result if the wheel was not properly maintained.

■■ Issues pertaining to whether a product is defective and whether the manufacturer had a duty to warn of potential risks are questions of fact which the trier of fact is entitled to decide. (*Williams v. Brown Manufacturing Co.*, 93 Ill.App.2d 334, 236 N.E.2d 125, *rev'd on other grounds*, 45 Ill.2d 418, 261 N.E.2d 305.) By its verdict, the jury concluded that defendant's preventive maintenance program was inadequate, rather than find either that the wheel was maldesigned or defective or that the third-party defendants breached a duty to warn, if indeed such a duty existed. We cannot say that this verdict is against the manifest weight of the evidence.

With respect to its first argument, defendant relies upon the testimony of Dr. Gordon, the expert in metallurgy. In pertinent part, Dr. Gordon's testimony revealed that corrosion substantially contributed to the failure of the wheel assembly on Bus No. 30. During his examination of the wheel, he observed the most severe corrosive damage in the vicinity of the trough area of the base rim, an area not visible when the wheel is assembled. Dr. Gordon concluded that this condition was caused by the design of this type of rim. Defendant also points to evidence which shows that 20-30 other wheels dismounted from buses in defendant's fleet shortly after the accident displayed similar signs of excessive rust and corrosion in the trough area. Upon this evidence, defendant theorizes the cause of the accident as follows: (1) the defective design of the wheel assembly caused excessive corrosion to occur on the interior surfaces of the component parts; (2) the bus went out of control when the

locking mechanism failed, causing the side ring to pull off of the base rim; and (3) the driver was unable to regain control of the bus because the side ring severed the hydraulic brake line.

■■ After reviewing the record, we do not agree with defendant's contention that the design of the wheel assembly in question was defective. A standard from which to determine whether a product is defective was set forth in *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339, 342, 247 N.E.2d 401, 403: "* * * those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function." The record is devoid of evidence which either tends to show that the wheel assembly was defective, or otherwise satisfies the elements for a finding of strict liability in tort. (*See Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182; Restatement (Second) of Torts § 402A (1965).) Dr. Gordon's testimony merely reveals that moisture could collect in a particular area of the rim due to its design, and thus, corrosion in that area would tend to be more pronounced if the rim was not properly maintained. But this testimony, standing alone, does not suggest that this particular design is defective. Indeed, Dr. Gordon would be unqualified to offer such an opinion since he was not presented as an expert in engineering design.

The fact that several other wheels were also heavily corroded leads defendant to the conclusion that the design was defective. However, a contrary conclusion could be reached just as easily; from this evidence, it could reasonably be inferred that the inadequacies of defendant's preventive maintenance program were widespread. Moreover, defendant's contention is directly refuted by the testimony of the only witness presented at trial who was an expert with respect to wheel rims. The engineer employed by Firestone testified that the design of this particular type of wheel assembly had been widely accepted throughout the industry for several years.

■■ Defendant's second argument, pertaining to an alleged breach by the third-party defendants of a duty to warn, is similarly unsupported by the record. The rule is well established that even if a product is not found to be defective, liability on a strict liability in tort theory can be imposed on the manufacturer and distributor of a product since "[a] duty to warn exists where there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm might or could occur if no warning is given." (*Kirby v. General Paving Co.*, 86 Ill.App.2d 453, 457, 229 N.E.2d 777, 779.) However, under the circumstances of this case, we do not find such a duty owing to defendant. In addition to the fact that defendant

failed to allege that such a duty was owed to it by the third-party defendants,[4] the record supports a holding that "unequal knowledge" was not present. Not only had defendant been engaged in the bus transportation business for over 30 years, but defendant's chief mechanic admitted that cracked rims had been discovered by defendant's maintenance personnel prior to 1967. Moreover, just two months before the accident, a cracked rim was replaced on Bus No. 30, however, an investigation to determine the cause of this failure was not conducted. Also, defendant's president testified that prior to the accident, he had observed mechanics in defendant's maintenance garage removing rust from wheel rims. This evidence indicates that defendant's maintenance personnel were aware of the problems created by rust and corrosion in wheel assemblies. Consequently, we hold that the third-party defendants did not owe a duty to defendant to warn of the hazardous condition which could result from excessive corrosion in the wheel assembly.

■■ We also hold that there was sufficient evidence in the record upon which the jury could find that defendant was negligent in the manner in which its preventive maintenance program was conducted, and thus, that defendant failed to exercise the high duty of care imposed upon common carriers. This duty was defined by our supreme court in *Galena and Chicago Union R.R. Co. v. Fay*, 16 Ill. 558, as follows:

> "Carriers of passengers are not insurers of life, limb, or against loss, damage or injury, as carriers of goods are, except for acts of Providence or the public enemy; but *they are required to use the highest degree of care, diligence, vigilance and skill in the selection of materials, construction of their vehicles, and other means of transportation, and for their conduct and management, repairs and preservation of them,* with a view to the comfort, safety and transportation of passengers and their baggage; and *they are liable for slight neglect or carelessness in any of these particulars,* * * * *."*
> (16 Ill. 558, 571.) (Emphasis added.)

In view of the foregoing, we hold that the jury properly returned a verdict against defendant. (*Gasperik v. Simons*, 124 Ill.App.2d 360, 260 N.E.2d 458.) We also hold that the trial court, upon the evidence presented, properly directed a verdict on the third-party complaint in favor of the third-party defendants. (See *Larson v. Harris*, 38 Ill.2d 436, 231 N.E.2d 421; *Pedrick v. Peoria and Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504.) Because of our disposition of defendant's appeal, we need

---

[4] In its third-party complaint, defendant alleged that the third-party defendants failed to warn defendant of the dangerous condition of the wheel assembly. However, defendant did not allege that such a duty was in fact owed to it.

not consider plaintiff's cross-appeal. Accordingly, we affirm the judgments of the trial court.

Judgments affirmed.

DOWNING, P. J., and LEIGHTON, J., concur.