CHARLOTTE HAMMOND, Plaintiff-Appellee, *v.* NORTH AMERICAN ASBESTOS CORPORATION, Defendant-Appellant.

Fourth District   No. 17360

Opinion filed May 6, 1982.—Rehearing denied June 3, 1982.

Heyl, Royster, Voelker & Allen, of Peoria (William J. Voelker, Jr., Frederick P. Velde, and Judy A. Schieber, of counsel), for appellant.

James Walker, Ltd., of Bloomington, for appellee.

JUSTICE LONDRIGAN delivered the opinion of the court:

Plaintiff, the wife of an asbestos worker who contracted asbestosis, sued defendant, North American Asbestos Corporation, for loss of consortium on theories of strict liability and wilful and wanton negligence. Judgment was entered on the jury's verdict awarding plaintiff $125,000 in compensatory and $375,000 in punitive damages, and defendant appeals.

Plaintiff's husband, Charles Hammond, was employed by Union Asbestos and Rubber Company (UNARCO) from 1953 until 1971. During this time Hammond contracted respiratory diseases and asbestosis, which is a chronic, degenerative condition caused by inhaling asbestos fiber and dust. Defendant existed from 1953 until 1978 and was a wholly owned subsidiary of Cape Industries, Ltd., a British corporation, which mines and sells raw asbestos. Plaintiff alleged that defendant supplied raw asbestos directly to UNARCO, which in turn produced various asbestos insulation products. Defendant also sold raw asbestos to Calabrian Industries, a New York barter corporation, which bartered the asbestos to the Federal government for its critical materials stockpile. When the stockpile was reduced by the government, portions of defendant's asbestos were sold to UNARCO for its manufacturing enterprise. Plaintiff's count in strict liability alleges that defendant sold an unreasonably dangerous product without providing warnings of its danger; plaintiff's other count alleges that defendant wilfully and wantonly failed to provide warnings.

Defendant first contends that plaintiff has no cause of action in strict liability because the raw asbestos is not a product within the meaning of section 402A of the Restatement (Second) of Torts. Section 402A provides:

> " '(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>> '(a) the seller is engaged in the business of selling such a product, and
>> '(b) it is expected to reach the user or consumer in the condition in which it is sold.

'(2) The rule stated in subsection (1) applies although

'(a) the seller has exercised all possible care in the preparation and sale of his product, and

'(b) the user or consumer has not brought the product from or entered into any contractual relation with the seller.' " (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 621, 210 N.E.2d 182, 187.)

Defendant argues that because raw asbestos fiber must be processed or refined and has no marketable value unless such processing occurs, raw asbestos should not be considered a product because it is not sold in substantially the same condition in which it is expected to reach the ultimate user or consumer.

The Restatement does not define the term "product." Illinois cases that have faced the question whether an article or substance is a product within the meaning of the Restatement have concluded that a particular item will be considered a product if to do so will effectuate the policy basis for imposing strict liability in tort. (*Lowrie v. City of Evanston* (1977), 50 Ill. App. 3d 376, 365 N.E.2d 923.) The public policy concern at issue is whether the loss caused by a defective article should be borne by those who have created the risk or reaped the profit by placing the item in the stream of commerce. *Suvada.*

As the court in *Lowrie* noted, products are not simply something resulting from a production or manufacturing process. Such a definition would exclude water, wood, all living things, and anything else that remains in a natural state at the time it is supplied and distributed. In *Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill. 2d 443, 266 N.E.2d 897, the supreme court concluded that although whole blood may be viable human tissue and thus not manufactured as an article of commerce, it is a product in much the same way as other articles that are distributed for human consumption in their natural state. Thus, that raw asbestos must undergo processing does not automatically preclude a determination that it is a product.

Significantly, the drafters of section 402A did not rule out consideration of whether raw materials, in their natural state, should be considered products. Comment *p* of section 402A indicates that the drafters only refrained from taking any position concerning the possible liability of a seller when the product is expected to, and does, undergo further processing or other substantial change after it leaves his hands but before it reaches those of the ultimate user or consumer. The following examples are instructive:

"It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability under the rule stated in this

Section. If, for example, raw coffee beans are sold to a buyer who roasts and packs them for sale to the ultimate consumer, it cannot be supposed that the seller will be relieved of all liability when the raw beans are contaminated with arsenic, or some other poison. * * * On the other hand, the manufacturer of pigiron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer. The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes. * * *" Restatement (Second) of Torts sec. 402A, Comment *p*, at 357 (1965).

■■ Based upon the foregoing, we conclude that raw asbestos is a product within the meaning of the Restatement. Although raw asbestos is processed before it is ultimately sold to consumers, raw asbestos and not some manufactured article caused the harm in this case. There was no change in the condition of the asbestos from the time it was sold until it reached the "ultimate user," Charles Hammond. Moreover, the argument that but for the manufacturing process the asbestos would not have been altered begs the question.

The evidence showed clearly that handling asbestos in any form produces dust. Liability may be imposed in a products case if the injury results from a condition of the product and the condition is unreasonably dangerous and existed when the product left the defendant's control. (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368.) The proclivity of raw asbestos to give off dust was certainly a condition that existed when the product left defendant's control.

The next issue is whether this inherent property of raw asbestos is unreasonably dangerous. A product can be inherently dangerous and yet not defective. If unaccompanied by sufficient warnings, a product that contains inherent dangers is defective when it is sold and therefore unreasonably dangerous. *Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, 412 N.E.2d 959.

Although no court has ever held that raw asbestos is unreasonably dangerous, the weight of authority has held that a jury question exists whether products containing asbestos are defective and unreasonably dangerous. (*Borel v. Fibreboard Paper Products Corp.* (5th Cir. 1973), 493 F.2d 1076; *Migues v. Fibreboard Corp.* (Dec. 7, 1981), 50 U.S.L.W. 2365.) It has also been held as a matter of law that asbestos products are defective and unreasonably dangerous. *Flatt v. Johns Manville Sales Corp.* (E.D. Tex. 1980), 488 F. Supp. 836.

■■ These results are applicable here, for asbestos products are harmful because of the asbestos they contain. Thus, if products containing asbestos can be unreasonably dangerous, it follows that asbestos itself can

be unreasonably dangerous. Furthermore, there was sufficient evidence for the jury to conclude that raw asbestos is inherently dangerous and was unreasonably dangerous when sold when not accompanied by sufficient warnings.

■■ Defendant next contends that the strict liability count of the complaint must fail because defendant did not sell anything, arguing that it was only a broker, facilitating the sale of asbestos between customers and the parent corporation, Cape Industries, Ltd. Irrespective of defendant's role in the marketing of asbestos in its normal course of business, this argument ignores the evidence adduced concerning the government contract·sales. The testimony and documents disclose that Calabrian directly negotiated contracts between defendant and itself to supply asbestos for the Federal government's stockpile of critical materials. Thus, insofar as the government contract sales are concerned, defendant became a seller within the meaning of the Restatement for which liability attaches. A seller who circulates a defective product—even though he has not created the defect—may be held liable in strict liability to an injured user; the nature of the commercial transaction by which the product is placed in the stream of commerce is irrelevant to the policy considerations that underlie strict liability. *Crowe v. Public Building Com.* (1978), 74 Ill. 2d 10, 383 N.E.2d 951.

Illustrative is a letter from Robert Cryor, president of North American, to Commodity Credit Corporation concerning these transactions. Cryor represented to Commodity Credit:

> "No other firm or individual is authorized to offer any Amosite or Blue Crocidolite asbestos produced by our parent organization, The Cape Asbestos Co. Ltd., London, or by any of its affiliated companies.
>
> \* \* \*. For your guidance, we wish to mention that The Cape Asbestos Co. Ltd., and its affiliates, while producing approximately 90% of the world's supply of all grades of amosite asbestos, are virtually the sole producers of the \* \* \* fiber grades meeting the Stockpile specifications."

Defendant nevertheless argues that plaintiff could directly trace only 12,500 pounds of defendant's asbestos to UNARCO from the stockpile sold by the government. Defendant concludes that because this amount represents only 2½ days' production out of the 16 years that plaintiff's husband worked at the Bloomington plant, plaintiff did not demonstrate either that any of this stockpile asbestos was used at a time when her husband was present in the plant or that his exposure to asbestos from defendant was anything more than *de minimis* during that time.

Defendant's argument is without merit. Documentary evidence in the record demonstrates that over the period of years when asbestos was sold

to the government stockpile millions of pounds of the substance changed hands. Furthermore, Government Services Administration records indicate that millions of pounds of amosite asbestos of South African origin were subsequently sold to UNARCO when the stockpile was reduced. Because Cape produced 90% of the world's supply of amosite asbestos and was virtually the sole producer of the grade of asbestos meeting the government specifications, it defies credibility to believe that a large portion of the South African amosite asbestos sold by the government to UNARCO did not originate in defendant's barter sales. A jury could reasonably conclude that defendant's role in marketing asbestos was sufficient to establish plaintiff's theory of strict liability. See *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401.

■■ Defendant next contends that it was relieved of a duty to warn of the dangers of asbestos by its compliance with government specifications in the Calabrian barter sales. The evidence indicated that as part of the specifications for the sales, certain identifying marks were required to be placed on the bags of raw asbestos. Defendant argued at trial that the government requirements precluded them from placing any other marks, including warnings, on the bags. One of the defendant's corporate witnesses, however, admitted that defendant never asked the government whether warnings could be placed on the bags.

Defendant cites *Hunt v. Blasius* (1977), 55 Ill. App. 3d 14, 370 N.E.2d 617, for the proposition that compliance with government standards and specifications precludes liability with respect to any product that complies with those specifications. We find defendant's position untenable. In affirming this court's conclusion that the manufacturer of a highway sign was not liable for injuries sustained in a fatal automobile collision with a highway sign, the supreme court held that an independent contractor owes no duty to third persons to judge the plans, specifications, or instructions that he has merely contracted to follow. If the contractor carefully carries out the specifications provided him, he is justified in relying upon the adequacy of the specifications unless they are so obviously dangerous that no competent contractor would follow them. *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368.

Under this rule liability will be precluded unless it is foreseeable or obvious that the plans or specifications were defective or that the material or product, while inherently dangerous, was not generally known to be so. (See *Littlehale v. E. I. du Pont de Nemours & Co.* (2d Cir. 1967), 380 F.2d 274.) Here, although defendant was aware of the dangerous conditon of the asbestos, it never sought to inform the government of that condition or inquired whether the government was aware of the danger or whether it could place warnings in addition to the government-specified markings

on the bags. Under these circumstances, defendant cannot rely as a matter of law on the theory that government specifications preclude liability. The issue was a question of fact for the jury to determine. *Simien v. S.S. Kresge Co.* (5th Cir. 1978), 566 F.2d 551; *Raymond v. Riegel Textile Corp.* (1st Cir. 1973), 484 F.2d 1025.

Defendant also argues that it was relieved of the duty to warn UNARCO and the government because they had the same or greater degree of sophistication and knowledge of the dangers of asbestos as did defendant. The cases cited by defendant stand for the proposition that a duty to warn exists when there is unequal knowledge, actual or constructive, and the defendant possessed of such knowledge knows or should know that harm might occur if no warning is given. In the absence of unequal knowledge there is no duty to warn. See *Robinson v. Deck* (1975), 33 Ill. App. 3d 71, 337 N.E.2d 316.

The rule cited by defendant does not apply in this case. It cannot be said that asbestos workers had equal knowledge of the dangers attributable to the handling of asbestos. Defendant, however, was aware of an *industry-wide history of asbestos-related diseases in insulation workers.* It was also established that as early as 1949 a comprehensive study of South African mine workers, including those at one of Cape's mines, produced findings that all the workers had contracted some form of asbestos-related disease. There was no proof that Charles Hammond or his fellow workers knew of these dangers. Thus, there was unequal knowledge that required defendant to warn of the known dangers. See Restatement (Second) of Torts secs. 388, 389 (1965).

■■ Defendant next attacks the award of punitive damages and argues first that punitive damages may not be recovered in an action for loss of consortium. Loss of consortium, a common law action, is based on injury to the spousal relationship. (*Dini v. Naiditch* (1960), 20 Ill. 2d 406, 170 N.E.2d 881.) The customary reason for denying punitive damages in an action for loss of consortium is that the action is derivative. For example *Hughey v. Ausborn* (1967), 249 S.C. 470, 154 S.E.2d 839, refused to allow recovery of punitive damages and quoted with approval *Golden v. R.L. Greene Paper Co.* (1922), 44 R.I. 231, 233, 116 A. 577, 580:

> " 'When a wife has been injured by the negligent act of another, there has not been an intentional wrong committed against the husband. There cannot be said to be a direct injury to other than the practical and material elements of his right of consortium.' "
> (249 S.C. 470, 477, 154 S.E.2d 839, 842.)

See also *People's Home Telephone Co. v. Cockrum* (1913), 182 Ala. 547, 62 So. 86.

Other courts have reached the opposite result and have permitted claims for punitive damages by construing injury to the spousal relation-

ship as a direct harm to the plaintiff's spouse. For example, in *Sheats v. Bowen* (D. Del. 1970), 318 F. Supp. 640, the plaintiff's wife was injured in an automobile collision; the plaintiff sought punitive damages in his loss of consortium count. Citing *Hughey, Peoples Home Telephone*, and *Golden*, the defendant argued that punitive damages were not recoverable under Delaware law for loss of consortium. Because the Delaware Supreme Court had never considered the question, the district court analyzed the components of the cause of action to determine what Delaware law would require. The court noted that Delaware law (1) permits the recovery of punitives in addition to compensatories when an act is done maliciously, wantonly, or recklessly, (2) does not distinguish between direct and indirect injuries, (3) treats a claim for loss of consortium as separate from and independent of the other spouse's claim for injuries, and (4) allows punitive damages in suits alleging the wanton alienation of affections. *Sheats* concluded:

> "In view of the settled Delaware law that a husband has a distinct claim for a tort against a third person when his wife is injured and he is thereby deprived of her society or services or put to other expense or loss as a result of the wrong and that punitive damages may be awarded by way of punishment when a right is invaded by a malicious, wanton or reckless act, the authorities from other jurisdictions are not convincing." (318 F. Supp. 640, 648.)

See also *Kohl v. Graham* (D. Colo. 1962), 202 F. Supp. 895.

Actions for loss of consortium are derivative or indirect in the sense that an injury to the spousal relationship is generally established by proof that the other spouse has suffered harm. The plaintiff spouse brings the action in his or her own name for his or her own benefit, however, and in that sense the action is not derivative.

■■ ■ No Illinois court has decided whether punitive damages may be awarded in an action for loss of consortium. Punitive damages are imposed to punish defendants and to deter them and others from engaging in similar conduct in the future; as punishment meted out in civil actions, however, they are disfavored. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) Although plaintiff herein sought punitive damages under the theory of wilful and wanton misconduct and not under the theory of strict liability, the problems described in *Moore v. Remington Arms Co.* (1981), 100 Ill. App. 3d 1102, 1113-15, 427 N.E.2d 608, 616-17 (punitive damages and products liability), are also relevant here. Given the dual nature of plaintiff's action—plaintiff sues in her own name and in her own behalf but depends in large part on evidence concerning her husband's employment and his resulting injuries—we are reluctant to extend punitive damages to actions for loss of consortium. Even if we were to interpret plaintiff's request for unspecified damages in her

products liability count as including punitive damages (*Kimes v. Trapp* (1964), 52 Ill. App. 2d 442, 448, 202 N.E.2d 42, 45), our reasoning would preclude recovery of them under that theory. Allowing recovery of punitive damages in actions for loss of consortium would involve important considerations of public policy, and such an extension should be made by the supreme court.

.We therefore conclude that the trial court erred in submitting to the jury the question of punitive damages; given this decision, we need not address defendant's alternative arguments against the award.

■■ Finally, the award of compensatory damages is supported by the evidence. Both counts requested compensatory damages, and plaintiff's proof was sufficient to establish liability under either theory. The award of compensatory damages was not excessive. Plaintiff presented evidence of medical expenses in the amount of $33,000. At the time of the suit, Charles Hammond was 54 years old and in declining health. The evidence clearly indicated that his health would continue to deteriorate and that additional and substantial medical expenses would be incurred. The deterioration of his health would, likewise, have an influence on those other elements of the marital relationship compensable in a consortium action. The jury's award of $125,000 in compensatory damages is a fair and just amount, intended as it is to compensate for measurable as well as immeasurable losses. We have carefully examined defendant's other assertions of error and upon due consideration of the record conclude that they are without merit.

We therefore affirm all portions of the circuit court's judgment except the award of punitive damages.

Affirmed in part and reversed in part.

GREEN, P. J., and MILLS, J., concur.