BRUCE E. RUEGGER, Plaintiff-Appellant, v. INTERNATIONAL HARVESTER COMPANY, Defendant-Appellee and Third-Party Plaintiff (T.H. Ryan Cartage Company, Inc., Third-Party Defendant).

First District (2nd Division)   No. 1—90—0783

Opinion filed June 25, 1991.

James A. Swanson, of Oak Brook, for appellant.

Arnstein & Lehr, of Chicago (Louis A. Lehr, Jr., Arthur L. Klein, and John T. Wagener, of counsel), for appellee.

JUSTICE COCCIA delivered the opinion of the court:

Plaintiff Bruce E. Ruegger appeals from an order entering summary judgment in favor of defendant International Harvester Company in this products liability case. Plaintiff contends on appeal that genuine issues of material fact remain as to whether or not defendant owes a duty to plaintiff. (Third-party defendant T.H. Ryan Cartage Company is not a party to this appeal.)

The record in this summary judgment case sets forth the following relevant facts.

On July 1, 1974, Navistar International (previously known as International Harvester) manufactured the 1974 model COF-4070B cab-chassis in question. The cab-chassis was sold to Lee Truck Sales. When Lee Truck Sales ordered the cab-chassis from defendant, it generated a vehicle order which listed the components Lee Truck Sales wanted on the vehicle. The cab-chassis in question is described by Federal regulations as an "incomplete vehicle" because it requires further manufacturing operations.

When the cab-chassis left defendant's possession, it did not have a "fifth wheel," which is a device used to couple the trailer to the tractor, carry the load, and to articulate the tractor both horizontally and in some degree vertically. Without the fifth wheel, the cab-chassis cannot be hooked up to any kind of a trailer. Thus, the vehicle could perform no useful function without the addition of a fifth wheel and truck body of some type. The fifth wheel would be located behind the cab and mounted on the frame rails.

The cab includes a glad hand storage bracket, which was placed four feet above the ground so that the glad hands could be removed while the truck driver was standing on the ground. The "glad hand connections" are the air brake and electrical line connections between the cab and the truck body which would later be added.

In May 1975, Lee Truck Sales sold the cab-chassis to T.H. Ryan Cartage Company, plaintiff's employer. T.H. Ryan knew at the time of the purchase that it would be leasing the cab to the C.A. Roberts

Company account, to pull flatbed and half-side trailers. This type of truck had connections which could be reached from the ground. T.H. Ryan knew at the time it purchased the chassis that a fifth wheel, deck plates and grab handles could be ordered from defendant as optional equipment. They were not ordered, since the deck plates and grab handles were only necessary if the glad connections could not be reached from the ground.

When deciding the proper type of cab-chassis to buy for an account, T.H. Ryan would consider, *e.g.*, how much weight was to be hauled, how many axles were required, and the amount of power needed. These details changed whenever the cab-chassis was to be assigned to a new account.

T.H. Ryan sometimes ordered trucks with fifth wheels on them; sometimes bought a fifth wheel from someone other than the dealer and installed it itself; and sometimes used fifth wheels from old tractors which it had in its shop.

When the lease to C.A. Roberts expired, T.H. Ryan assigned the cab-chassis to the Hy-Temp lease, and it was driven by plaintiff. Hy-Temp used a different type of truck body than C.A. Roberts had used. This truck body now made it impossible to reach the glad connections from the ground. From 1978 to 1980, plaintiff drove the cab-chassis in question. Because he could not reach the glad connections from the ground, he climbed up behind the cab to reach the connections. There was no deck plate on which he could stand, so he balanced himself on the truck's frame rails. Plaintiff had asked T.H. Ryan several times to install a deck plate on the truck, but T.H. Ryan did not do so, although it had previously done so for plaintiff on other trucks.

On July 9, 1980, plaintiff fell from the truck. He was attempting to connect the glad hands to the Hy-Temp van trailer. Plaintiff testified at a deposition that he was standing on the frame rails when he lost his footing and fell between the frame rails and drive shaft, striking his back on the edge of the frame rails.

The parties conducted extensive discovery proceedings, including depositions of many of defendant's expert engineers and employees. Many of them testified that the absence of a deck plate and grab hold was dangerous for a truck driver who was standing on the truck's frame rails while trying to adjust the glad hand connections. They also agreed that one probable end use of the cab-chassis manufactured by defendant was as a semi-tractor such as the one Hy-Temp used when plaintiff was injured.

John Stilson, plaintiff's expert engineer, testified in a deposition that the product manufactured by defendant is a semi-tractor, that

the deck plates and hand holds which were omitted are safety equipment, and that the omission of this equipment contributed to plaintiff's fall. Stilson opined that defendant should have warned the user of danger in working in the area behind the cab and on the frame rails without this safety equipment.

Both parties moved for summary judgment. The trial court subsequently entered summary judgment in favor of defendant.

■■ Summary judgment is appropriate where the pleadings, depositions and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c); *Fooden v. Board of Governors of State Colleges & Universities* (1971), 48 Ill. 2d 580, 272 N.E.2d 497.

■◢■ Plaintiff contends that the trial court erred in determining, as a matter of law, that defendant owes no duty to plaintiff. The issue of duty may be decided as a question of law. (*Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 343 N.E.2d 465.) In a strict liability action, the injury must result from a condition of the product; the condition must be unreasonably dangerous; and the condition must exist at the time the product leaves the manufacturer's control. *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182; *Medina v. Air-Mite Devices, Inc.* (1987), 161 Ill. App. 3d 502, 515 N.E.2d 770.

■ Here, no dangerous condition existed at the time the cab-chassis left defendant's control. Defendant manufactures and sells vehicles which could be used to pull a tractor-trailer such as the one plaintiff drove when he was injured. The essential parts missing included the truck body itself, and a "fifth wheel," which is a coupling in the form of two disks which rotate on each other for use in attaching a semi-trailer or other body to a tractor. See, *e.g., Dennis v. Ford Motor Co.* (3d Cir. 1973), 471 F.2d 733.

Other cases involving the addition of a unit behind a truck's cab have found the manufacturer of the cab owes no duty where a subsequent party adds a unit of some type. See, *e.g., Dennis v. Ford Motor Co.*, 471 F.2d 733 (no duty owed by defendant manufacturer of truck cab-chassis where fifth wheel is later added by different party); *Verge v. Ford Motor Co.* (3d Cir. 1978), 581 F.2d 384 (no duty owed by defendant manufacturer of a truck cab-chassis where different party later converts vehicle into garbage truck); *Elliott v. Century Chevrolet Co.* (Tex. Civ. App. 1980), 597 S.W.2d 563 (no duty owed by defendant manufacturer of truck chassis where different party later installs beer storage unit behind chassis); see also *Willeford v. Mayrath Co.* (1972), 7 Ill. App. 3d 357, 287 N.E.2d 502 (no duty owed by

defendant manufacturer of farm elevator component parts where different party later assembles the parts).

Here, defendant did not assemble the cab-chassis, determine its ultimate use in connection with some type of fifth wheel and truck body, or choose the type of optional equipment which might be either helpful or necessary to make the final vehicle safe. The vehicle at issue was a standard cab-chassis used for many different purposes, including pulling a semi-trailer, straight truck, garbage truck or tow truck.

In 1974, defendant manufactured the cab-chassis ultimately incorporated into the tractor-trailer combination from which plaintiff fell six years later. Defendant sold the cab-chassis to Lee Truck Sales, an independent dealer which could choose to use the product in a variety of ways. When the vehicle left Navistar, it did not include a fifth wheel. Plaintiff's expert witness, John Stilson, testified that "[i]t's very rare that a [buyer] purchase[s] a factory-installed fifth wheel." Instead, "they go out and get one from some after market shop. It is pretty standard."

Russell Noble testified that the manufacturer could not know what the customers would use the cab-chassis for, even if the manufacturer made the assumption that the cab-chassis would pull a semi-trailer. He explained why a manufacturer would not install deck plates as standard equipment on a cab-chassis:

> "The fact that a vehicle is going to be used as a tractor in a semi-trailer combination does not automatically mean that an individual has to climb on the back of the cab in order to do his hooking and unhooking. Secondly, the vast majority of fleets desire to have local sources for the application of their deck plates and/or do it themselves. Third, there is no knowledge or little knowledge at the time this vehicle is produced, even with this line setting ticket that we have, as to what type of fifth wheel it's going to have, whether it will be a fixed fifth wheel, a slider, or what type of other equipment, such as toolboxes, will be mounted back of cab. So a manufacturer cannot safely predict the configuration of a satisfactory deck plate on every chassis cab he manufactures."

Lee Sholund, a reliability analyst employed by defendant, testified that it "would not be a very wise" decision for defendant to install deck plates as standard equipment because defendant would not know such information as "fuel tank size, wheel bases, cab lengths, fifth wheel locations."

Robert McAfee, a design engineer for defendant, testified that when designing the cab-chassis in question, they "were concerned [in] the design of the vehicle with a lot of flexibility to the end user to adapt an unfinished vehicle if you will, a partially completed vehicle by government specifications, so that the customer could then finish that vehicle in accordance with the uses they had in mind." He explained that, "[q]uite frankly we didn't know all the uses that they would put our vehicles. I think they anticipated, if I might call it, the normal use or the intended use of the CO-4070-B." That normal use was only generically defined by defendant as "on-highway premium heavy duty vehicle for straight truck application, for dump truck application or semi tractor application."

McAfee also testified that in addition to using the cab-chassis for a semi-tractor, "[t]here are other operations they could use it for, and since it went to Lee Truck Sales, which is a retailer, what he had in mind I doubt if he knew, because it depends on the customer that comes in looking at it, because a lot of these trucks are modified at the dealer level to satisfy a customer's particular use."

In fact, even if a fifth wheel had been included by the manufacturer, it would still be impossible to know the end use of the vehicle. McAfee testified that approximately 95% of fifth wheels are generic, and not designed for any specific type of trailer. You cannot tell by the design of a fifth wheel that kind of trailer is going to be towed by a cab-chassis. Thus, even if a certain manufacture of a fifth wheel is put on a tractor, that tractor is not limited by the fifth wheel to pulling a specific kind of trailer.

In 1975, T.H. Ryan bought the cab-chassis for the purpose of leasing it to C.A. Roberts Company, knowing that company would be using it to pull flatbeds and half-side trailers. T.H. Ryan did not order the optional deck plates and grab holds from defendant, knowing C.A. Roberts' drivers could reach the glad hand connections from the ground. In fact, at the point defendant sold the cab-chassis, it could not know whether to include one or several deck plates, or no deck plates at all. For example, T.H. Ryan installed a sliding fifth wheel which could be moved back and forth along the frame rails. Depending on the use of the vehicle and position of the fifth wheel, anywhere from zero to five deck plates might have been used. Defendant had no way of knowing the ultimate user's needs, and thus the equipment was optional, not standard.

In 1978, when Hy-Temp began leasing the vehicle in question, it served a completely different purpose. The glad hands could no longer be reached from the ground, due to the different fifth wheel

used by Hy-Temp. The fact that T.H. Ryan refused plaintiff's repeated requests to correct this perceived danger by adding optional equipment has no relevance to the determination before this court, *i.e.*, whether defendant owed a duty where no dangerous condition existed at the time the cab-chassis left the manufacturer's control.

Defendant had no control over T.H. Ryan's method of assembly, subsequent leasing, and usage of the vehicle without the use of a deck plate or grab hold. The ultimate makeup of the cab-chassis sold by defendant was determined later, long after its purchase, and that makeup changed as each user adapted the vehicle to its own needs over the years. (See *Willeford v. Mayrath Co.* (1972), 7 Ill. App. 3d 357, 287 N.E.2d 502.) Thus, the product was not in a dangerous condition when it left defendant's control. The dangerous condition, if any, arose not from the manufacture by defendant in 1974, but instead from the later assembly and subsequent lessee's particular usage of the vehicle in 1980, without the inclusion of the deck plate and grab holds.

Plaintiff also argues that defendant invited drivers to climb up behind the cab when they placed a platform on top of the fuel tank.

Plaintiff testified at a deposition and explained the maneuvering necessary to climb up behind the tractor: "[T]here's a step on the battery box. There's a step, and then you step up on the battery box and there's a handle on the side of the tractor to do that with. Then you have a step up on the saddle tank which would be the left saddle tank." He continued: "When you're standing on the battery box you're basically level with your saddle tank and at that time then you can make the move with your right leg and foot to the saddle tank and you reach for the holders." On top of the saddle tank is a "little standing platform." Finally, you would end up on the saddle tank with both feet, and your body turned. "Well, then that's after you release your left hand off of the rail, you're onto the saddle tank. You pull yourself over and you're onto the platform on the saddle tank." However, there was "no way you can stand on that platform on the saddle tank and reach the trailer without stepping on the rail."

It is clear from this testimony that the platform on the saddle tank was not a stair designed so that the driver could easily step up onto it in order to reach the glad hand connections. In fact, it required some athletic maneuvering just to get on top of the fuel tank, and even more precarious maneuvering to get onto the frame rails.

Moreover, other testimony indicates that the fuel tank platform was for mechanics who were working on the tractor, not for drivers attempting to attach glad hand connections to the trailer.

Claude Travis, an expert engineer for defendant, testified at a deposition that the step was "partially under the cab and it—it's used by mechanics, to a large degree, when they are working on the engine transmission." Travis also acknowledged that drivers probably used the platform, too.

Ronald C. Oldsen, a senior engineer for defendant, testified at a deposition that the purpose of the platform was for the "operator and/or the maintenance people. As you can see, that particular step extends partially underneath the cab, also, and it's primarily designed as a service aid for access to the engine compartment, tool stand or for a serviceman to stand on or sit on, as he's working on the engine area."

John Sullivan, an engineer for defendant, testified at a deposition that the tank platform is standard on this type of vehicle. It is used for service. "It's an area where mechanics like to stand or sit." To get up to that platform, you "need another step down below to climb up." You could order this extra step "on the fuel tank strap."

"Q. So you got a step on top of the tank but then you would make them order the step in order to get to the step that's standard?

A. If I recall that's the way it was. This one on top of the fuel tank was also there for maintenance purposes."

Sullivan also acknowledged that the platform could be used to reach the glad hands "whe[n] they're in their storage location."

■ We find that the mere existence of the fuel tank servicing platform is not sufficient to establish a genuine issue of material fact as to the duty the defendant manufacturer owed plaintiff such that plaintiff could withstand the motion for summary judgment. The evidence does not permit a reasonable inference that defendant invited drivers to climb behind the cab-chassis to adjust the glad hand connections and thereby created a dangerous condition.

■ We conclude that the lack of a deck plate or hand holds cannot serve as a basis for imposing a duty on the defendant manufacturer here. The trial court properly entered summary judgment as a matter of law in favor of defendant.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

HARTMAN and DiVITO, JJ., concur.