DOMINIC L. SPARACINO, Plaintiff-Appellant, v. ANDOVER CONTROLS
CORPORATION, Defendant and Counterdefendant-Appellee (Communication Management Corporation, Defendant and Third-Party Plaintiff and
Counterplaintiff-Appellant; Township High School District 214 *et al.*, Third-Party Defendants).

First District (1st Division)   Nos. 1—89—3374, 1—90—1208 cons.

Opinion filed March 30, 1992.

Carponelli, Krug & Lerum, of Chicago (Stephen P. Carponelli and James V. Noonan, of counsel), for appellant Dominic L. Sparacino.

Lord, Bissell & Brook, of Chicago (Richard D. Stowell and Hugh C. Griffin, of counsel), for appellant Communication Management Corporation.

Charles R. Purcell and Bernard J. Hennessy, both of Chicago, for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff Dominic L. Sparacino filed a complaint against defendants Andover Controls Corporation (Andover) and Communication Management Corporation (CMC) based upon the theories of strict products liability and negligence. CMC filed a counterclaim against Andover for contribution. On June 5, 1989, Andover's motion for summary judgment against plaintiff was granted by the circuit court. The summary judgment was made final and appealable pursuant to Supreme Court Rule 304(a) (134 Ill. 2d. R. 304(a)) by an order issued November 6, 1989. On March 26, 1990, the circuit court granted summary judgment in favor of Andover and against CMC and entered an order incorporating the necessary Rule 304(a) language, making it final and appealable. Both Sparacino and CMC appeal the respective summary judgment orders in this consolidated matter.

Prior to April 1985, Andover was in the business of manufacturing microprocessing equipment for building automation systems. In May 1983, Andover sold an energy management system (EMS) to CMC which was installed at the Elk Grove High School, District 214, by CMC.

On April 10, 1985, Sparacino, a 54-year-old chemistry teacher, employed by District 214 for the past 18 years, arrived at school at 6 a.m. Sparacino purposely arrived at school early to ensure that no students would be present while he prepared a chemical experiment

designed to produce chlorine gas. The chlorine gas was used in a senior experiment one time each semester. This same experiment had been an accepted aspect of the honors chemistry curriculum for many years, and Sparacino had performed it numerous times prior to April 10, 1985.

On that morning, Sparacino entered classroom 207, the chemistry laboratory, turned on the lights and the radio and began to prepare the proper solutions for the desired chemical reaction. The radio ran on electricity provided from an outlet in the hood of the large exhaust fan under which Sparacino placed his chemical solution. Sparacino flipped the switch to activate the exhaust fan to draw out noxious chlorine gas that was likely to escape during the chemical reaction. The fan failed to operate although Sparacino flipped the switch several times.

The chemical reaction began to produce the noxious chlorine gas. Realizing that even the slightest exposure to this gas could be deadly, Sparacino ran to the windows to provide ventilation which he anticipated would be provided by the exhaust fan. As Sparacino opened the window, the chlorine gas streamed toward him and he was forced to inhale the noxious gas.

As a result of inhaling the fumes, Sparacino suffers from acute bronchial damage and chronic respiratory and cardiac insufficiencies such as persistent coughing, angina and shortness of breath. Sparacino becomes easily fatigued and suffers occasional dizzy spells. Sparacino, therefore, claims that he is totally and permanently disabled and can no longer teach.

The exhaust fan Sparacino attempted to activate failed to operate on April 10, 1985, at 6:15 a.m. because it was scheduled by a computerized EMS to be inoperative until 6:30 a.m. It is undisputed that Andover manufactured the system and that CMC installed it. There was no notice posted on, around or near the hood fan or the light switch indicating the hours during which the exhaust fan could be operated. Neither Andover nor CMC warned the teachers of District 214 that particular toggle switches would be inoperative at certain times. Further, it is undisputed that no manual overrides to the exhaust fan, which would allow a user to control the fan when it was not scheduled to be operative, were implemented into the system.

Sparacino filed a two-count complaint against Andover and CMC alleging that CMC negligently sold, distributed and installed a dangerous and defective EMS and failed to (1) give adequate warnings on the dangers of the inability to override the safety exhaust system, (2) make it possible to override the safety exhaust system, and (3) pro-

vide sufficient instructions concerning the safe handling of the EMS and that Andover negligently sold, distributed and installed various strategic equipment for a dangerous and defective EMS and failed to (a) place adequate warnings on various strategic equipment on the dangers of the inability to override the safety exhaust system, (b) provide strategic equipment that made it possible to override the safety exhaust system, and (c) provide sufficient instructions on its strategic equipment concerning the safe handling of the exhaust system. Additionally, Sparacino claimed that Andover was strictly liable because the EMS was inherently dangerous, defective and unreasonably unsafe in design and manufacture.

On July 23, 1987, Andover moved for summary judgment against Sparacino. On December 16, 1987, CMC filed a counterclaim against Andover for contribution. Then, CMC moved for summary judgment against Sparacino on February 18, 1988. Both summary judgment motions were briefed and a hearing was held on June 5, 1989. The circuit court granted Andover's motion and denied CMC's motion. Andover then moved for summary judgment against CMC on the counterclaim and to have the summary judgment order against Sparacino certified final and appealable. On November 6, 1989, the circuit court granted Andover's motion to make the summary judgment order against Sparacino final and appealable. On March 26, 1990, the circuit court granted Andover's motion for summary judgment against CMC and incorporated the necessary Rule 304(a) language in its order, making it appealable. (134 Ill. 2d R. 304(a).) Sparacino and CMC appeal the respective summary judgment orders entered against them. These two appeals have been consolidated.

Much reliance is placed on the affidavit and deposition of Robert Klein, Andover's director of marketing. Klein's affidavit states, *inter alia,* that Andover was never provided with written specifications or documents about the installation or use of the EMS, that it was never consulted regarding design, selection, installation or ultimate use of the EMS, and that Andover did not install or program the EMS.

During Klein's deposition, he testified that he quickly reviewed the specifications which were provided to CMC. CMC was shown a videotape by Andover, which demonstrated how a customer could actually write programs for the EMS. The EMS Andover sold to CMC was "user programmable," which means that the user actually programs the EMS with options and functions it deems necessary to meet the specifications. Klein testified that the EMS sold to CMC was model AC256, which is Underwriter's Laboratory (UL) number 916. UL 916 is a category under energy management. That listing indi-

cates that UL has performed tests dealing with static electricity buildup, electrical surges in power, fires, explosions, malfunctions in the system, overrides and typical applications of turning on and off fans.

Klein stated that there are two types of override situations. One type is hardware override. Andover's EMS provides a hardware override for each existing output point. The second type of override may be accomplished through software control which could have been programmed by District 214. There is also an on/off control which is technically not an override. An example of an on/off control is a toggle switch for a fume exhaust fan. An on/off control is something that is manually operated. For example, an exhaust fan with a toggle switch can be turned on when experiments are performed and turned off when experiments are completed. Klein stated that he could not be sure whether the EMS overrides the exhaust fan in room 207 of District 214 because it would depend upon the wiring and installation of the EMS, which was not performed by Andover.

Summary judgment should only be granted if the pleadings, depositions and the admissions on file, together with affidavits, if any, present no genuine issue as to any material fact, thereby entitling the moving party to judgment as a matter of law. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005.) The pleadings, depositions and affidavits must be construed strictly against the moving party and liberally in favor of the opponent. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871.) Summary judgment is a drastic means of disposing of litigation and should be granted only when the right of the moving party is clear and free from doubt. (*Purtill*, 111 Ill. 2d at 240, 489 N.E.2d at 871.) Therefore, such remedy must be cautiously granted so that a party's right to trial is not usurped in the presence of material, conflicting evidentiary facts and inferences. *Montes v. Hawkins* (1984), 126 Ill. App. 3d 419, 466 N.E.2d 1271.

■■ A manufacturer is liable under the theory of strict tort liability if the plaintiff proves that his injuries resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182; *Gasdiel v. Federal Press Co.* (1979), 78 Ill. App. 3d 222, 396 N.E.2d 1241.) A product is unreasonably dangerous where it fails to perform in the manner reasonably expected in light of its nature and intended function (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401), and where the defect in the product subjects those exposed to it to an unreasonable risk of

harm. (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368.) The question of what is unreasonably dangerous is ordinarily a question for the trier of fact. *Nelson v. Hydraulic Press Manufacturing Co.* (1980), 84 Ill. App. 3d 41, 404 N.E.2d 1013.

Sparacino argues that the EMS which Andover sold to CMC was not designed to override the manual switch on the exhaust fan, that an override mechanism may have prevented plaintiff's injuries and that Andover had the technology to provide this safety feature and knew the danger involved in its absence, and that Andover, therefore, had a nondelegable duty to provide this safety device and failure to provide it renders the system inherently dangerous. The specifications for the District 214 project were developed by Raymond J. Green & Associates, architects, and Gruman Butkus Associates, energy consultants and design engineers. The EMS supplied by Andover to CMC was selected by CMC to meet the Green/Gruman Butkus specifications. Further, Andover did not design the heating, ventilating, air conditioning (HVAC) system into which the EMS was incorporated. Andover did not directly receive plans and specifications regarding the District 214 project and did not install the EMS in the building.

The EMS does not automatically override toggle switches or control devices because it is not the system, but rather the wiring to the particular switches that actually overrides them. Moreover, the EMS is user programmable, which allows the customer to write his own strategies into the system. The EMS is shipped without any program built in, and the dealer organization, CMC in this case, supplies the actual application program which should conform to the specifications of the user, District 214.

■ The EMS did not fail to perform in the manner reasonably expected in light of its nature and intended function. (*Dunham,* 42 Ill. 2d 339, 247 N.E.2d 401.) Sparacino is essentially arguing that Andover is responsible for defects in parts other than the EMS system that it sold to CMC. Andover did not supply the exhaust fan switch. Relying on *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 319 N.E.2d 232, and *Derrick v. Yoder Co.* (1980), 88 Ill. App. 3d 864, 410 N.E.2d 1030, Sparacino argues that Andover had a nondelegable duty to assure that there was a manual override switch to the exhaust fan. However, these cases are distinguishable because:

> "*Rios, Derrick* and the other Illinois cases finding a nondelegable duty to install safety devices where the machine is unifunctional all involved suits against the manufacturer of the final product, that is the assembler. It is within the power of the assembler to install a safety device on a machine. But the man-

ufacturer of a component part has no control over that part once it is sold and has no control over the final assembly of the machine. *** As stated in *Jordan v. Whiting Corp.* (1973), 49 Mich. App. 481, 486, 212 N.W.2d 324, 328, *modified* [*sic*] (1976), 396 Mich. 145, 240 N.W.2d 468:

'The obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not *** extend to the anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another.' "

(*Curry v. Louis Allis Co.* (1981), 100 Ill. App. 3d 910, 915-16, 427 N.E.2d 254, 258.)

The items in the above cases were dangerous as assembled. The EMS, in the case at bar, was not dangerous as assembled. Rather, the manner in which CMC installed and programmed the EMS may have created a duty to warn on the part of CMC.

■ CMC programmed the EMS system in a manner which disabled the chemistry laboratory exhaust fan until 6:30 a.m. It was within CMC's power to install an override, safety device, when integrating the EMS with the HVAC. Andover's product was not defective or inherently dangerous because the EMS performed precisely in the manner in which it was programmed to perform. There is no evidence that the EMS malfunctioned or that it was inherently dangerous. As stated above, Andover does not have a duty to foresee that CMC would integrate the user programmable EMS in a dangerous or defective manner. No material question of fact exists concerning whether the EMS system was defective. We find that the circuit court properly granted Andover's motion for summary judgment on the strict liability count.

■ In order for a plaintiff to prevail in a cause of action for negligence, the plaintiff must show that the defendant owed him a duty of reasonable care and either failed to do something which a reasonably careful person would have done or did something which a reasonably careful person would not have done. (*Kossifos v. Louden Machinery Co.* (1974), 22 Ill. App. 3d 587, 317 N.E.2d 749.) The manufacturer of a product has a duty to warn if a product is inherently dangerous. (*Hammond v. North American Asbestos Corp.* (1982), 105 Ill. App. 3d 1033, 435 N.E.2d 540.) The duty to warn arises only where the manufacturer knows or should know of the danger and where unequal knowledge exists on the part of the user. (*Illi-*

*nois State Trust Co. v. Walker Manufacturing Co.* (1979), 73 Ill. App. 3d 585, 589, 392 N.E.2d 70, 73.) In order to find that the manufacturer should have known of the danger inherent in the product, it must be objectively reasonable to expect the user of the product to be injured in the manner in which the plaintiff was injured. (*Renfro v. Allied Industrial Equipment Corp.* (1987), 155 Ill. App. 3d 140, 158, 507 N.E.2d 1213, 1228.) It is not enough that the injury was merely conceivable. (*Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 466, 343 N.E.2d 465, 471.) Whether the plaintiff's injury was foreseeable by the manufacturer, and whether a duty to warn existed, are questions of law for the court to resolve, rather than questions of fact. *Genaust*, 62 Ill. 2d at 466, 343 N.E.2d at 471.

■ Sparacino and CMC argue that Andover had a duty to warn users of the potential dangers in connecting an exhaust fan to an EMS system without providing a way for the user to override the system's control of the fan because Andover had actual knowledge of the danger. Even assuming *arguendo* that Andover knew of the potential danger, it was not objectionably reasonable to expect that a chemistry experiment would be taking place in the school during nonoccupancy time, *i.e.*, at a time when no one is scheduled to be in the school, and, therefore, it is not foreseeable that the user of the exhaust fan would be injured in the manner in which plaintiff was injured. The question is not whether Andover knew or should have known that the exhaust fan would be controlled by the EMS system programmed for an occupancy schedule, but whether Andover knew or should have known that someone would conduct a chemistry experiment which produces noxious gases during nonoccupancy hours. The EMS system was user programmable, and Klein testified that there were a number of ways the EMS system could have been overridden. Further, Klein testified that universities and schools often utilize an occupancy schedule because students and teachers forget to turn off exhaust fans. Thus, the specification that the EMS be programmed on an occupancy schedule is not unusual when the building is a school. Klein further testified that he was not aware of any instance in which an occupancy schedule harmed a user. Additionally, Andover did not install or, more specifically, did not wire the EMS in a manner which would disable the exhaust fan. Therefore, there was no way Andover would know that the EMS was installed in a dangerous manner.

Since the specifications called for occupancy scheduling and it is not objectionably reasonable for Andover to foresee an injury sustained in the manner in which Sparacino's was, there likewise is no duty on Andover's part to warn CMC of the merely conceivable dan-

ger that someone would be injured during a chemistry experiment performed during nonoccupancy hours. There is no question of material fact concerning Andover's alleged duty to warn. We find that the circuit court properly granted summary judgment in favor of Andover and against CMC and Sparacino with regard to Andover's duty to warn.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'CONNOR and MANNING, JJ., concur.