NO. 4-96-0782

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NANCY ROTZOLL, as Administrator of the ) Appeal from

Estate of Elizabeth Benson, Deceased, ) Circuit Court of

Plaintiff-Appellant, ) Champaign County

v. ) No. 95L391

OVERHEAD DOOR CORPORATION, a ) 

Corporation, ) 

Defendant-Appellee, ) 

and ) 

OVERHEAD DOOR CORPORATION, a ) 

Corporation, )

Defendant-Counterplaintiff, )

v. ) 

PULMOCARE MEDICAL SUPPLY, INC. and TEE ) Honorable

JAY CENTRAL, INC., ) Thomas J. Difanis,

Counterdefendants. ) Judge Presiding.

________________________________________________________________

JUSTICE GARMAN delivered the opinion of the court:

In March 1995, Elizabeth Benson filed a complaint against defendant Overhead Door Corporation (Overhead Door), alleg­ing strict prod­ucts liability and negligence.  Since the filing of the com­plaint, Elizabeth has passed away.  Nancy Rotzoll, as administra­tor of Elizabeth's estate, has been substi­tuted as plaintiff.  The trial court granted defendant's motion for summary judg­ment, and plaintiff appeals.  We affirm.

Plaintiff alleged that on November 17, 1994, Eliza­beth, who was then 88 years of age, was entering Pulmocare Medical Supply's (Pulmocare's) place of business in Champaign with the use of a walker.  The automatic sliding glass door opened for Eliza­beth, but closed on her as she was continu­ing through the door­way, knocking her down and injur­ing her.  

The automatic sliding door system consists of several components.  Activating devices, such as motion detec­tors, initiate the opening and closing of the door by sensing movement as someone approaches either side of the door.  Without some sort of activa­tion device, the auto­matic door system would not func­tion at all.  Numerous variable settings, such as door closing speed, closing force, and the time delay before closing, are all set by the installer or the operator of the door system.  Regard­less of how these variables are set, other door components are designed to prevent the doors from closing on an individual who is crossing the threshold of the door.  Threshold protection is achieved through the use of transmitters and receivers that, when inter­rupt­ed by an object break­ing the plane of the door­way, prevent the door from shut­ting.

Defendant sells both complete and incomplete automatic door systems.  While defendant does sell door systems complete with activating devices such as motion detectors, the customer may order a system without such devices and pur­chase the devices from other suppliers.  All door systems do, however, come with some sort of threshold protection, and defendant offers its customers two alternative threshold safety devices.  The first is a twin "safety-beam" system, which consists of two pairs of trans­mitters and receivers, one pair installed at a height of 24 inches above ground, the other pair installed 48 inches above ground.  Two beams of light are transmitted across the threshold, and the continued interruption of either beam will stop the doors from shut­ting.  The second option is a "threshold sonar scan" system, which utiliz­es one safety beam as well as a "threshold scan."  This threshold scan is positioned 30 inches above ground and appears designed to detect persons or objects within a short dis­tance of the thresh­old on either side, not just those actually breaking the plane of the doorway.  As the zone of detec­tion produced by the threshold scan is broader than the two-beam system, the automatic doors will be prevented from closing in a greater number of situations.  

The automatic sliding door system at issue was ordered, installed, and configured by Tee Jay Central, Inc. (TJC), on behalf of its client Pulmocare.  TJC ordered a Series 2310, Model C1304 auto­matic door from defendant in March 1994.  The system was ordered without activating devices, as TJC chose to order motion detectors from two other manufacturers not made parties to this action.  For threshold protection, TJC chose the twin "safety-beam" system rather than the "threshold sonar scan" system to be utilized at Pulmocare's facili­ty.

In the proceedings below, the essence of plaintiff's allegations was that the twin safety-beam system manufactured by defendant was not designed to detect the presence of a walker crossing the plane of a doorway.  Plaintiff claims Elizabeth's walker crossed the threshold of the automatic door at Pulmocare's facility, but the safety beams passed through the walker uninter­rupted, thereby failing to prevent the door from closing on her.  Plaintiff alleged both strict liability and negligence on defen­dant's part for the defective design of the door system.  The trial court, in an order that does not contain written findings, granted defendant's motion for summary judg­ment.  Plaintiff's motion to vacate the order of summary judgment and to amend her pleadings was denied, and this appeal followed.

Summary judgment is appropriate when the pleadings, depositions, and admissions, together with any affidavits, show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 1994); 
Champaign National Bank v. Babcock
, 273 Ill. App. 3d 292, 299, 652 N.E.2d 848, 853 (1995); 
Malone v. American Cyanamid Co.
, 271 Ill. App. 3d 843, 845, 649 N.E.2d 493, 495 (1995).  When ruling on a motion for summary judgment, a trial court must view all evidence in the light most favorable to the nonmovant.  
Malone
, 271 Ill. App. 3d at 845, 649 N.E.2d at 495; 
Sparacino v. Andover Controls Corp.
, 227 Ill. App. 3d 980, 984, 592 N.E.2d 431, 434 (1992).  We review 
de
 
novo
 grants of summary judgment.  
Malone
, 271 Ill. App. 3d at 845, 649 N.E.2d at 495; 
Depre v. Power Climber, Inc.
, 263 Ill. App. 3d 116, 117, 635 N.E.2d 542, 544 (1994).  

Plaintiff challenges the trial court's grant of summa­ry judgment on his counts of strict liabil­ity and negli­gence.  To recover against a manu­fac­tur­er under the theory of strict liabil­ity, a plaintiff must prove his injury resulted from an unreason­ably dangerous condi­tion of the product that existed at the time the product left the manufacturer's control.  
Depre
, 263 Ill. App. 3d at 117-18, 635 N.E.2d at 544; 
Loos v. American Energy Savers, Inc.
, 168 Ill. App. 3d 558, 562, 522 N.E.2d 841, 844 (1988).  A product may be unreasonably dangerous due to a manu­facturing defect, a failure to warn, or a defect in design.  
Lamkin v. Towner
, 138 Ill. 2d 510, 528, 563 N.E.2d 449, 457 (1990); 
McColgan v. Envi­ronmental Control Sys­tems, Inc.
, 212 Ill. App. 3d 696, 699, 571 N.E.2d 815, 817 (1991); W. Keeton, Prosser & Keeton on Torts §99, at 695 (5th ed. 1984) (hereinafter Keeton).

Plaintiff here alleges strict liability based upon a defect in the 
design
 of the components manufactured by defendant and sold to TJC for installation at Pulmocare.  Plaintiff does not allege a failure by defendant to warn of a risk or hazard related to the way the components sold to TJC were de­signed.  Nor does plain­tiff allege any manu­fac­tur­ing defect, 
i.e.
, that the two-beam thresh­old protec­tion system was not in fact working at the time Eliza­beth crossed the thresh­old with her walker.  Rather, the essence of plaintiff's strict liability count is that the two-beam threshold protection system was defectively de­signed, since it was possible for the two narrow safety beams to pass through gaps in Elizabeth's walker as she began crossing the threshold of the doorway.

The law in Illinois is clear that the obliga­tion that gives rise to a duty to avoid reasonably foreseeable injury to another does not extend to the an­ticipation of how manufactured components, not themselves inherently dangerous or defec­tive, can become potentially danger­ous when integrated into a unit de­signed, assembled, installed, and sold by another.  
Sparacino
, 227 Ill. App. 3d at 986, 592 N.E.2d at 435; 
Depre
, 263 Ill. App. 3d at 119, 635 N.E.2d at 545.  In 
Sparacino
, the defen­dant, Andover Controls Corporation (Andover), was in the busi­ness of manu­fac­turing micro­pro­cessing equipment for building automa­tion systems.  Andover sold an energy management system (EMS) to codefendant Communica­tion Management Corporation (CMC) for instal­la­tion at a local high school.  Plaintiff Sparacino, a chemis­try teacher, arrived early to work one morning to prepare a chemical experi­ment that would produce chlorine gas.  He flipped on an overhead fan to draw out the noxious chlorine gas, but the EMS had been pro­grammed such that the fan would not operate until later in the day.  The plaintiff was injured as a result of inhaling chlorine gas.  Summary judgment in favor of Andover was granted.

The plaintiff had argued the EMS produced by Andover and sold to CMC was not designed to override the manual switch on the exhaust fan, that an override mechanism may have prevented his injuries, and that Andover had the technology to provide this safety feature and knew the danger involved in its absence.  However, the evidence disclosed that the specifica­tions for the product were developed by outside archi­tects, energy consultants, and design engineers.  CMC selected the EMS supplied by Andover based upon these specifications.  Andover did not design the heating, ventilating, and air-conditioning system into which the EMS was incorporated.  Andover was not given plans and specifica­tions for the project and did not install the EMS in the build­ing.  The EMS was user programmable, allowing the customer to customize the EMS as he or she saw fit.  CMC programmed the EMS for the high school.  
Sparacino
, 227 Ill. App. 3d at 985, 592 N.E.2d at 435.

The appellate court in 
Sparacino
 affirmed the granting of summary judgment in favor of Andover.  The court found that the EMS was not dangerous as assembled; rather, it was the manner in which CMC installed and programmed the EMS that was to blame.  Andover's product was not defective or inherently danger­ous, since the EMS performed exactly in the manner in which it was programmed to perform.  Andover had no duty to foresee that CMC would inte­grate the user-program­mable EMS in a dangerous or defective manner and, thus, summary judgment for defendant was proper.  
Sparacino
, 227 Ill. App. 3d at 986, 592 N.E.2d at 435.

A similar result was reached in 
Depre
.  In that case, the decedent was killed when the "false car" (a skeleton elevator car used during instal­lation of elevators in high-rise buildings) in which he was riding snapped apart from its hoisting mechanism and fell 49 stories.  Plaintiff sued the manufacturer of the stirrup bar that connected the car to the hoisting mecha­nism.  Plaintiff alleged the stirrup bar was defectively designed because it permitted only a single bolt to join the hoisting mechanism and the false car.  Plaintiff sug­gested defendant had a duty to provide some form of redundant connecting device.  
Depre
, 263 Ill. App. 3d at 117, 635 N.E.2d at 543-44.

Defendant was not provided with specifications from the purchaser of its product as to the design of the stirrup bar.  Defendant designed a standard stirrup bar, which allowed for attachment of a variety of mechanisms.  
Depre
, 263 Ill. App. 3d at 119, 635 N.E.2d at 545.  The appellate court affirmed the trial court's grant of summary judgment in favor of the defen­dant, since it was undisputed the defendant's stirrup bar con­tained two bolt holes and that it was left to the assem­bler of the final product (the false car) to determine whether to use one or two of the bolt holes:

"The final product in this case was the false car, which was designed by Dover Eleva­tor Company.  Dover Elevator Company pur­chased the motor and stirrup bar from [de­fendant], purchased the other component parts necessary for a fin­ished false car from other manufac­turers and assembled the false car.  By vir­tue of Dover Elevator Company's design of the false car, Dover could only utilize one of the two bolt holes provided by [defen­dant's] stirrup bar.  [Defendant] had no con­trol over how Dover Elevator Company in­stalled the stirrup bar, nor was [defen­dant] responsi­ble for the fact that the false car was not de­signed to take advantage of the redundant system that had been provided by [defen­dant]."  
Depre
, 263 Ill. App. 3d at 119-20, 635 N.E.2d at 545.

In the present case, defendant's motion for summary judgment was supported by two affidavits of Donald Moerbe, a representative of Horton Automatics (the division of Overhead Door responsible for making the door at issue).  Also at­tached were sworn interrogatory answers provided by TJC and an authenti­cated copy of the service and instal­lation manuals for the automatic doors.  Moerbe's affidavits, which were uncon­tra­dicted, established defendant's right to judgment as a matter of law, in light of 
Sparacino
 and 
Depre
.  According to Moerbe, defen­dant was not advised by TJC or Pulmocare as to how the door components sold by defen­dant would be inte­grated into the com­pleted auto­mat­ic door assembly system, which was designed and installed by TJC for Pulmocare.  Defendant was not advised of the typical consum­ers who fre­quent­ed Pulmocare.  Defen­dant had no role in setting or adjust­ing the closing speed, closing force, or time delay of the completed automatic door assembly.

As in 
both 
Sparacino
 and 
Depre
, there was nothing defective in the design of the product manu­fac­tured by the defendant.  Rather, in both cases (as in this case) the danger arose from the later assembly, design, and instal­lation of the complete system by a third party.  See also 
Ruegger v. Interna­tional Harvester Co.
, 216 Ill. App. 3d 121, 126, 576 N.E.2d 288, 290 (1991) (affirm­ing summary judgment in favor of defendant cab-chassis manufac­turer, where "defendant did not assemble the cab-chassis, deter­mine its ulti­mate use ***, or choose the type of option­al equip­ment which might be either helpful or necessary to make the final vehicle safe").  Moerbe's affidavits estab­lished defendant's lack of knowledge as to Pulmocare's clientele and any corresponding safety requirements, and we reject plain­tiff's contention, made at oral argument, that the very name "Pulmocare" should, in the minds of reasonable automat­ic door manufacturers, conjure up visions of elderly patrons with walk­ers.  See Keeton §101, at 706 ("If the maker of the compo­nent part *** knows or has reason to know that the part will be used in a way that will make the assembled product unreason­ably dangerous then such a seller may well be subjected to liabili­ty").  

Liability here is even more tenuous than in 
Sparacino
 and 
Depre
, considering that, at the time the door system at issue was sold to TJC for use at Pulmocare, defendant actual­ly offered an alter­na­tive threshold protection system to prevent the exact type of accident that occurred here.  The threshold sonar scan system de­scribed earlier, with its wider zone of detection, is depicted in defen­dant's installation instructions (attached to defendant's motion for summary judg­ment) detecting a person with a walker on the verge of crossing the threshold of the door system.  Plaintiff, in fact, attached this very same diagram to her response to defendant's motion for summary judgment.  This was an alter­na­tive design of the thresh­old safety device made avail­able by the defendant.  The defendant here was under no duty to inquire into the nature of the final use, assembly, and program­ming of the automatic door assembly or to investigate the nature of Pulmocare's business to evaluate the effectiveness of the safety devices chosen by TJC.  See 
Hunt v. Blasius
, 74 Ill. 2d 203, 209, 384 N.E.2d 368, 371 (1978) ("An independent contrac­tor owes no duty to third persons to judge the plans, specifica­tions or instructions which he has merely contracted to follow. If the contractor carefully carries out the specifica­tions provided him, he is justified in relying upon the adequacy of the specifications unless they are so obviously dangerous that no competent contractor would follow them"); 
Loos
, 168 Ill. App. 3d at 563, 522 N.E.2d at 845 (affirming summary judgment in favor of maker of support tower that collapsed, since tower itself was not defec­tive and defendant "was not asked to test its appropri­ate­ness in light of its intended use in the total system").  Defen­dant could not dictate to its custom­ers which partic­u­lar doors and safety systems they must buy.  See 
Ruegger
, 216 Ill. App. 3d 121, 576 N.E.2d 288 (affirming summary judgment in favor of defendant cab-chassis manufacturer, where defendant had no way of knowing the ultimate user's needs and thus left certain safe­ty equipment as optional, not standard); 
Kokoyachuk v. Aeroquip Corp.
, 172 Ill. App. 3d 432, 526 N.E.2d 607 (1988) (summary judgment in favor of maker of refrig­eration unit af­firmed where there was nothing in record to suggest defendant had any control over the later assembly of the trailer into which the unit was in­stalled).  In short, defendant did everything it could possibly have done in this case--it had foreseen the very type of accident alleged to have occurred here and offered, as an option to its custom­ers, an alternative safety device that would prevent such occurrenc­es, an option that TJC and Pulmocare chose not to pursue.  See 
Curry v. Louis Allis Co.
, 100 Ill. App. 3d 910, 915, 427 N.E.2d 254, 258 (1981) (affirming summary judgment for compo­nent part manufactur­er, suggesting it would be "absurd" to hold the maker of a component part liable because the assembler of the overall device chose not to install safety devices of­fered and sold by the component part manufactur­er); 
Willeford v. Mayrath Co.
, 7 Ill. App. 3d 357, 287 N.E.2d 502 (1972) (rejecting plain­tiff's strict liability claim against the defendant manu­facturer of elevator components, where elevator was ordered and assembled by third parties who chose not to attach a safety shield made available by defendant).

When a defendant requests summary judgment, the plain­tiff need not establish his case as he would at trial, but he must present some factual basis that would arguably entitle him to judgment.  
Malone
, 271 Ill. App. 3d at 845-46, 649 N.E.2d at 495.  If a defendant sup­plies sworn facts that, if uncon­tra­dicted, warrant judg­ment in its favor as a matter of law, a plaintiff may not rest on her pleadings to create a genuine issue of material fact.  
Carruthers v. B.C. Christo­pher & Co.
, 57 Ill. 2d 376, 380, 313 N.E.2d 457, 459 (1974); 
Cano v. Village of Dolton
, 250 Ill. App. 3d 130, 139, 620 N.E.2d 1200, 1207 (1993)
.  Where the moving party's affida­vits stand uncontradicted, the facts contained therein must be accepted as true (
Carruthers
, 57 Ill. 2d at 381, 313 N.E.2d at 460; 
Champaign National Bank
, 273 Ill. App. 3d at 299, 652 N.E.2d at 854) and, there­fore, the failure to oppose a summary judgment motion supported by affida­vits by filing counteraffidavits in response is fre­quently fatal (
Fitzpatrick v. Human Rights Comm'n
, 267 Ill. App. 3d 386, 391, 642 N.E.2d 486, 491 (1994)).  

In the present case, plaintiff has failed to present 
any
 factual basis that could potentially entitle her to judgment against defen­dant.  The facts contained in Moerbe's affidavits were uncontradicted and must be accepted as true, and they estab­lish defendant's right to judgment as a matter of law.  

Plaintiff's response to defendant's motion for summary judgment was sup­port­ed by various irrelevant correspondence between plaintiff's and defendant's counsel, two unsworn, unveri­fied statements of two occurrence witnesses, a copy of what appears to be the com­pleted order form for the doors at issue, and a copy of one page from defendant's installation manual.  None of these documents establish a genuine issue of material fact, and the unsworn, unverified statements cannot even be considered in reviewing the motion for summary judgment.  
Cano
, 250 Ill. App. 3d at 140, 620 N.E.2d at 1207; 
West v. Deere & Co.
, 201 Ill. App. 3d 891, 900, 559 N.E.2d 511, 518 (1990), 
aff'd
, 145 Ill. 2d 177, 582 N.E.2d 685 (1991).  Regardless of the fact that the state­ments were unverified, plaintiff has not suggested she needed additional time to secure the testimony of expert witnesses, and, in her appellate brief, she virtually concedes that no expert testimony would be needed to support her theory of liability.  See 
Glass v. Morgan Guaranty Trust Co.
, 238 Ill. App. 3d 355, 356, 359, 606 N.E.2d 384, 385, 386-87 (1992) (affirming summary judg­ment in favor of defendant manufacturer where 
plaintiff failed to identi­fy any expert witness to estab­lish any of the alleged design defects).  Even if it were assumed that the acci­dent oc­curred exactly as plain­tiff theo­rized, there is simply no legal basis for finding defendant strictly liable for her inju­ries, given the alternative safety device clearly shown in the record and the uncontradicted evi­dence defendant had nothing to do with the selection, instal­la­tion, and maintenance of the door system.

For many of the same reasons, summary judgment on plaintiff's negligence count was also proper.  For a plaintiff to prevail under a theory of design negligence, he must show that the quality of a particular product is insuffi­cient and that the duty of care on the part of the manufacturer required it to design something safer for the user.  
Carrizales v. Rheem Manu­facturing Co.
, 226 Ill. App. 3d 20, 36, 589 N.E.2d 569, 580 (1991); 
Kokoyachuk
, 172 Ill. App. 3d at 437, 526 N.E.2d at 609.  Regard­less of whether a plaintiff alleges strict liability for a design defect or design negli­gence, he has the burden of proving the existence of a defective condition in the product at the time it left the manufacturer's control.  
Kokoyachuk
, 172 Ill. App. 3d at 437-38, 526 N.E.2d at 610.  Since plaintiff has failed to show there was a genuine issue of materi­al fact as to whether defen­dant's doors were defectively de­signed, summary judgment on the negligence count was similarly proper.  See 
Willeford
, 7 Ill. App. 3d 357, 287 N.E.2d 502 (rejecting plaintiff's negligent design claim against the defendant manufactur­er of elevator components, where elevator was ordered and assem­bled by third parties who chose not to attach a safety shield made available by defendant).

In conclusion, various theories were brought up at oral argu­ment as to how, from a factual standpoint, the mishap oc­curred in this case.  An appeal from a summary judgment is neither the time nor the place to suggest new or different theories as to how an accident occurred and how liability thereby arose.  We are limited to consid­er­ing the pleadings, deposi­tions, and admis­sions, together with any affida­vits, that were properly before the trial court.  
Champaign National Bank
, 273 Ill. App. 3d at 299, 652 N.E.2d at 853.  Plaintiff is bound by the theory of liability propounded in the proceedings below--that the twin threshold beams passed through gaps in Elizabeth's walker and failed to stop the door from shutting on her.  Any blame for failing to make the facts of the occurrence or the theory of liability more clear must fall on plaintiff.  Regard­less of what plaintiff's two occur­rence wit­ness­es proferred in their state­ments, both state­ments were unsworn and unverified and, there­fore, could not be consid­ered by the trial court when ruling on defendant's summary judgment motion and cannot now be consid­ered by this court.  
West
, 201 Ill. App. 3d at 900, 559 N.E.2d at 518.  While no one dis­putes Elizabeth was injured, it is well settled that the fact that an injury has oc­curred does not in and of itself prove that a product is defec­tive.  
Depre
, 263 Ill. App. 3d at 118, 635 N.E.2d at 544; 
Ralston v. Casanova
, 129 Ill. App. 3d 1050, 1060, 473 N.E.2d 444, 451 (1984).

For the reasons stated, we affirm the judgment of the trial court.

Affirmed.

KNECHT, J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

Defendant has obtained summary judgment by trick, moving for summary judgment on the basis that plaintiff did not have sufficient evidence to prove her case but filing that motion before any substantial discovery had been completed.  

There are two ways a defendant who moves for summary judgment may meet its initial burden of production.  See 4 R. Mi­chael, Illinois Prac­tice §40.3, at 271-72 (1989) (Civil Proce­dure Before Trial).  One way is similar to the way a plain­tiff would estab­lish his right to summary judg­ment:  by affir­ma­tively showing that some element of the case must be re­solved in defendant's favor.  A defen­dant who uses that method is re­quired to prove something it would not be re­quired to prove at trial; at trial the burden would be on plaintiff 
to prove the element, not on defendant to disprove it.  
Carruthers
 is an example of this traditional method of proof.  In 
Carruthers
 defen­dant pre­sent­ed affida­vits that affir­ma­tively estab­lished defen­dant was not in charge of the work.  
Carruthers
, 57 Ill. 2d at 378, 313 N.E.2d at 458.  

The second method was recognized in 
Celotex Corp. v. Catrett
, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 275, 106 S. Ct. 2548, 2553-54 (1986).  In that case, Celotex, the movant, could not prove its products were not the cause of plaintiff's inju­ries.  Celotex was nevertheless entitled to summary judg­ment because plain­tiff, who had the burden of proof, likewise could not produce any evidence that a Celotex product was in­volved.  
Celotex
 held that a defen­dant satisfies its initial burden of production when it "point[s] out" there is an absence of evidence to support the plaintiff's position.  
Celotex
, 477 U.S. at 325, 91 L. Ed. 2d at 275, 106 S. Ct. at 2554.  The Illinois cases may require the defen­dant to do more than "point out" the absence of evidence.  See 4 R. Mi­chael, Illinois Prac­tice §40.3, at 272 (Civil Procedure Before Trial) ("may not be done by a mere recital in the defen­dant's affidavit to this effect").  In 
Kimbrough v. Jewel Cos.
, 92 Ill. App. 3d 813, 817, 416 N.E.2d 328, 331 (1981), for example, defen­dant was able to produce a deposi­tion of the plaintiff in which plain­tiff stated she did not know why she fell, and answers to inter­rogato­ries in which plaintiff stated there were no other known eyewit­ness­es. 
 Defendant's burden is certainly reduced with a 
Celotex
-type motion.  A 
Celotex
-type motion pres­ents the rare situa­tion of a motion for summary judgment where the burden of proof is essen­tially on the nonmovant. 

In either case, 
Celotex
-type motion or traditional motion, once defen­dant has satis­fied its initial burden of production, the burden shifts to plaintiff to present some factual basis that would arguably entitle her to a judgment under the applica­ble law.  
Kimbrough
, 92 Ill. App. 3d at 819, 416 N.E.2d at 333 (
Celotex
-type motion).  Because defendant's initial burden is so high with a traditional motion for summary judg­ment, it is misleading to say there is generally a burden on plaintiff to present some factual basis in those cases.  The plaintiff is not re­quired to file counteraffidavits in response to a tradi­tional motion.  The only caveat 
is that, if defendant's affida­vits are uncontest­ed, the material facts therein must be accepted as true.  
Carruthers
, 57 Ill. 2d at 380, 313 N.E.2d at 460.  

When defendant files a 
Celotex
-type motion, it is essen­tial that plaintiff be given adequate time to gather evi­dence.  
Celotex
, 477 U.S. at 322, 91 L. Ed. 2d at 273, 106 S. Ct. at 2552 ("adequate time for discovery"); 
Webber v. Armstrong World Indus­tries, Inc.
, 235 Ill. App. 3d 790, 795, 601 N.E.2d 286, 290 (1992) ("The discovery may establish that plain­tiff does not have evidence of all the necessary elements of his case"); 
Cole Taylor Bank v. Corrigan
, 230 Ill. App. 3d 122, 126-27, 595 N.E.2d 177, 180 (1992) (objec­tive of discovery to insure that judgments rest on the merits and not upon the skillful maneuver­ing of counsel).   

     "Where a motion for summary judg­ment is 

made by a party on the basis that the respon-

dent, who has the burden of proof, cannot 

prove a prima facie case, it is critical that 

the respon­dent be given a reason­able oppor-

tu­nity to conduct discovery before summary 

judgment is ren­dered against him."  4 R. 

Michael, Illinois Practice §38.4, at 227,  

(1989) (Civil Procedure Before Trial).

See generally 4 R. Michael, Illinois Practice §39.4, at 255 (1989) (Civil Procedure Before Trial); see also 
Fooden v. Board of Gover­nors of State Colleg­es & Univer­sities
, 48 Ill. 2d 580, 587, 272 N.E.2d 497, 500 (1971) (summary judgment 
if
 what is contained in the pleadings and affidavits would have consti­tuted all of the evidence before the court at trial and the court would have directed a verdict on that evidence).

Some decisions cite the language of section 2-1005 of the Code of Civil Procedure that a defendant may move for summary judgment "at any time" (735 ILCS 5/2-1005(b) (West 1994)) and refuse to consider the argument that a motion for summary judg­ment is premature unless there has been strict compliance with Supreme Court Rule 191(b) (145 Ill. 2d R. 191(b)).  Rule 191(b) provides that in order to continue a motion for summary judg­ment an affidavit of the party is required, naming the per­sons whose affida­vits cannot be pro­cured, showing why the affida­vits cannot be pro­cured, stating what affiant believes the persons would testify to if sworn, and giving reasons for that belief.  

A plaintiff should not be required to comply with Rule 191(b) when a defen­dant files a 
Celotex
-type motion.  See 4 R. Mi­chael, Illinois Prac­tice §39.5, at 255 (1989) (Civil Procedure Before Trial).  It is one thing to require plaintiff to comply with Rule 191(b) when defendant has affirma­tively shown that defendant is entitled to judgment, but it is quite another to require such compliance when defen­dant, at an early stage, merely suggests that plaintiff is unable to prove his case.  Plaintiff may not know what the witnesses will testify to before discovery is taken and accord­ingly be unable to comply with Rule 191(b) at that time.  Rule 191(b) was adopted before 
Celotex
-type motions were widely used and was never intend­ed to apply to them.  See 
Gresham v. Kirby
, 229 Ill. App. 3d 952, 954-55, 595 N.E.2d 201, 203 (1992); 
Benner v. Bell
, 236 Ill. App. 3d 761, 768-69, 602 N.E.2d 896, 901 (1992).

The complaint in this case was filed in March 1995.  Defendant's motion for summary judgment was filed in March 1996, 
before
 
the
 
depositions
 
of
 
the
 
occurrence
 
witnesses
 
had
 
been
 
taken
.  The sched­uling order re­quired that the deposi­tions of the occurrence witnesses be taken by June 30, 1996, and that plain­tiff's expert be disclosed by July 30, 1996, and then deposed by August 30, 1996.  Amazingly, defendant argued that the circuit court, in deciding the motion for summary judgment, should not consider state­ments that plain­tiff had taken from the occurrence witness­es, because they were un­sworn.  The problem in this case was not the form of the state­ments, but the premature filing of the motion.  The premature filing had additional effects.  If plain­tiff wanted to submit the affida­vit of an expert, the timing of the motion required plain­tiff to do so before she was required to decide on an expert and before the expert had an opportu­ni­ty to read the depositions of the occur­rence witnesses.  I do not view plaintiff's argument that summary judgment should be denied even in the absence of expert testimony as a concession that plaintiff would not seek expert testimony.  

When a person walked through the automatic sliding doors in this case, the following things happened.  The motion sensor (supplied by others), mounted above the doors, detected motion in the detection zone in front of the doors.  The motion sensor relayed that information to the control (supplied by defendant).  The control caused the sliding doors to open and held the doors open as long as the motion sensor detected motion.  The doors contained a safety-beam system (supplied by defen­dant), which consisted of infrared light beams in the sliding doors at heights of 24 and 48 inches, which would detect anything in their paths, approximately the width of a pencil.  When the dual beams detect­ed anything, they would relay that information to the control, which would not allow the doors to close.  Dual safety beams are standard equipment on defendant's sliding doors, but defendant provides an option, a threshold sonar scan system.  Under this option the second beam is replaced with a "threshold scan" at a height of 30 inches, which apparent­ly scans not just a pencil width, but a cylinder with a diameter of perhaps 15 inches between the sliding doors.  There is no warning in defendant's materials that its standard equipment, the dual safety beams, is inadequate when the doors are used by slow-moving persons using walkers or that the threshold sonar scan system should be used in that situation.  The overhead motion sensor is apparently a sonar system.  

Defendant argues it is entitled to summary judg­ment under the traditional test.  Defen­dant argues that it has proved that no act or omis­sion of defen­dant was the proximate cause of plaintiff's inju­ries.  That is not correct.  We do not know how this accident happened.  It is possible that an act or omission of defendant was the cause of this accident.  The control, manufactured by defendant, may have failed to respond properly to information supplied by the motion sensor that there was motion in the detection zone.  The safety-beam system, manufac­tured by defen­dant, may have failed to alert the control that something had broken the path of the safety beams.  The safety-beam system may be an improper design where people with walkers use the sliding doors, and defendant may have failed to warn that some other device was necessary.  The set­tings for the motion sensor, con­trol, and safety-beam system, recommended by defendant, may have been inadequate.  

The majority recognizes that when ruling on a motion for summary judgment the court must view all evidence in the light most favorable to the nonmovant.  Slip op. at 4.  The majority violates that rule here.  The majority states that defendant did everything it could have done in this case and that it offered an option (the threshold sonar scan system) that would have prevented the accident in this case.  Slip op. at 10, 11.  I see nothing in defendant's affidavits that would support those conclusions.  The majority states (slip op. at 9) that "there was nothing defective in the design of the product manu­factured by the defendant."  In the absence of expert testi­mony, I do not understand how that statement can be made.  The majority states (slip op. at 14) there is "uncon­tra­dicted evidence defen­dant had nothing to do with the selec­tion, instal­lation, and maintenance of the door system."  Defendant's service and instal­lation manuals certainly seem to make recommendations how its doors should be selected, in­stalled, and maintained.  The in­staller is a defendant in this case, and none of the installer's personnel had been deposed at the time of the motion, although the install­er had answered plaintiff's (not defendant's) inter­rogatories.

The majority states (slip op. at 13) that the facts contained in Moerbe's affidavits establish defendant's right to summary judgment as a matter of law.  Moerbe is defendant's vice-president of sales and marketing.  The only clear fact in Moerbe's affidavit was that defen­dant did not supply the motion detec­tors used on the Pulmocare pro­ject.  Moerbe stated that defendant was not aware that components (apparently motion detec­tors) from BEA Corpo­ra­tion (BEA) and C&K Systems, Inc. (C&K), would be added to its automatic door, but defendant had to know that motion detec­tors would be supplied by someone.  It appears that defendant sometimes supplied BEA and C&K motion detectors itself.  Moerbe stated that defen­dant was not in­volved in decid­ing what the adjustments should be for closing speed, closing force, and time delay.  In the very next sentence, however, Moerbe admits that defendant makes recommenda­tions as to these settings.  A review of defendant's service manual and installa­tion instruc­tions indi­cates that defendant provides very specific directions regarding the instal­lation of its doors and that installers have little, if any, discretion in the final result.  Moerbe stated that defendant was "never advised of the traffic that frequented Pulmocare," and that may be true, but certainly defendant was aware that persons with walkers sometimes used its automatic doors.  Defendant's manual contained an illustration of such a use.  

The general rule is that the occurrence of an injury, in and of itself, is insufficient to show the exis­tence of a product defect.  However, a 
prima
 
facie
 case that a product was defective and that the defect existed when it left the manufac­turer's control is made by proof that in the absence of abnormal use or reasonable secondary causes, the product failed to perform in the manner reasonably to be expected in light of its nature and intended function.  
American Family Insurance Co. v. Village Pontiac-GMC, Inc.
, 223 Ill. App. 3d 624, 628-29, 585 N.E.2d 1115, 1119 (1992).  Automatic sliding doors are not reasonably expected to close on people using them.  It is true that the manufacturer of a compo­nent part need not antici­pate every possible use of his product.  The manufac­turer of a venti­lation system that can be used to dis­charge stale air need not anticipate problems that might occur when the system is used to discharge poisonous gases.  See 
Sparacino
, 227 Ill. App. 3d 990, 592 N.E.2d 431.  It is diffi­cult, howev­er, to charac­ter­ize defen­dant in this case as the unknowing manufac­turer of a compo­nent part.  Defen­dant has not shown any abnor­mal use of these doors, or secondary causes, such as improp­er set­tings made by the install­er.

The majority indicates that the complaint alleged only design defects, not manufacturing defects or a failure to warn.  Slip op. at 3, 5.  The 
amended
 complaint clearly alleges manu­fac­turing defects.  Count II of the 
original
 com­plaint says that defendant designed and/or manufactured the door with compo­nents that did not have adequate service life and failed to supply adequate instruc­tions.  We should not be overly technical with the pleadings.  A summary judg­ment is not a substi­tute for a motion to dismiss.  See 
Janes v. First Federal Savings & Loan Ass'n
, 57 Ill. 2d 398, 405-06, 312 N.E.2d 605, 609 (1974).